UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 23-20884-CIV-MORENO**

EARTH, WIND & FIRE IP, LLC, a California
limited liability company,

        Plaintiff,

vs.

SUBSTANTIAL MUSIC GROUP LLC, a
Wyoming and Georgia limited liability
company, and STELLAR
COMMUNICATIONS, INC., an Indiana
corporation,

        Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### FACTS

Earth, Wind & Fire is a limited liability company owned by the sons of Maurice White,

founder of the musical group "Earth, Wind & Fire." Plaintiff owns all trademark rights

associated with "Earth, Wind & Fire." Earth, Wind & Fire is a well-known musical group that

has released 42 albums and placed seven top ten singles on the Billboard "Hot 100" Sales Charts

since 1971, often with texts or graphics identifying "Earth, Wind & Fire" as the sources of the

music recorded on those albums or singles. The group has sold 90 million records worldwide

and continues to perform live up to 80 times per year. Plaintiff uses Facebook, websites, and

other social media to promote their live musical events. Defendants decided to form and

promote a band, in which Richard Smith would be the guitarist that would perform the music of

1

Earth Wind & Fire.  It is undisputed that Smith played with the Earth, Wind & Fire for a few years, but the size of his role during those years is in dispute.  Regardless, Defendants were well aware of the fame of Earth, Wind & Fire and called the new band, "Earth Wind & Fire Legacy Reunion" and "The Legacy Reunion of Earth, Wind & Fire."  They also used Plaintiff's word mark and the iconic "Phoenix" logo mark.  Plaintiff demanded Defendants stop the conduct, and in response, Defendants changed their name to "Legacy Reunion of Earth Wind & Fire Alumni." Defendants also made logo and coloristic changes and ceased usage of the "Phoenix" logo.  After some back and forth in early October 2019 over the details of the logo, Plaintiff explained in an email dated October 18, 2019, that while it was "not in position to agree that the matter was resolved, the attached proposed logo was preferred over the current logo that is being used to promote upcoming concerts."

Between the parties, there is dispute as to what the gap in time from October 2019 to May 2022 meant.  Plaintiffs observed that Defendants stopped all live touring in November 2019, which caused it to believe that the infringing activities had become moot.  Defendants interpreted Plaintiff's October 18, 2019, email as the "final substantive email."  Defendants state that the online activities referenced have remained online since 2019, which it states "renders [Earth, Wind & Fire]'s statement regarding the alleged mootness of Defendants' allegedly infringing activities untruthful."  In May 2022, Plaintiff learned that Defendants intended to start touring again in September 2022.  Plaintiff found that the promotional activities, while better than before, still infringed upon its rights.  In June 2022, Plaintiff sent a letter demanding Defendants stop the alleged infringing promotional activities and filed the present action.

The parties filed separate summary judgment motions.  First, Defendants argue that Plaintiff's allegations as to the EARTH WIND & FIRE word mark must fail, as a matter of law,

through an application of the nominative fair use doctrine. Second, they argue that Plaintiff's allegations as to "both the EARTH WIND & FIRE word mark and the so-called PHOENIX logo marks must also fail due to Defendants' affirmative defenses of laches, estoppel, and acquiescence." Plaintiff argues in its summary judgment motion that Defendants are liable for trademark infringement, false designation of origin, and false advertising under the Lanham Act for a multitude of reasons. For the reasons below, the Court denies the Defendants' motion for summary judgment and grants Plaintiff's motion for summary judgment. The Defendants are enjoined from infringing upon Plaintiff's Trademarks and a bench trial on damages will be held during the week of **May 28, 2024**, with a calendar call on **Tuesday, May 21, 2024**. The pending motions *in limine* are denied as moot.

## LEGAL STANDARD – SUMMARY JUDGMENT

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the "burden to demonstrate the basis for its motion, and [it] must identify the portions of the record 'which it believes demonstrates the absence of a genuine issue of material fact.'" *Id.* (internal quotation marks omitted). "The movant may meet this burden by demonstrating that the nonmovant has failed to present sufficient evidence to support an essential element of the case." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995) (The movant may satisfy its burden "by 'showing' or 'pointing out' to the Court that there is an absence of evidence to support the non-moving parry's case." (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548)). Provided that the movant meets its burden, the

3

burden then shifts to the nonmovant to show that a genuine issue of material fact exists. *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311-12 (11th Cir. 2018). To establish a factual dispute sufficient to avoid the entry of summary judgment, the nonmovant must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1289 (11th Cir. 2018) (citation omitted). "However, a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Est. of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citation omitted). Nevertheless, courts "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997) (citation omitted).

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court addresses first Defendants' Motion for Partial Summary Judgment. Defendants seek Summary Judgment as to the following claims asserted against Defendants: (1) Trademark Infringement, (2) Unfair Competition, False Designation of Origin, and False Endorsement, (3) Federal False Advertising, and (4) Federal Trademark Dilution. Defendants argue that Plaintiff's allegations fail as a matter of law through the application of the nominative fair use doctrine. They argue after that allegations fail through Defendants' affirmative defenses of laches, estoppel, and acquiescence.

## LEGAL STANDARD - NOMINATIVE FAIR USE

Nominative fair use occurs when "the defendant has used the plaintiff's mark to describe the plaintiff's product for the purposes of . . . comparison to the defendant's product." *Parsons v. Regina*, 847 Fed. App'x. 776 (11th Cir. 2021) (citing *Commodores Entm't Corp. v. McClary*, 314 F. Supp. 3d 1246, 1249 (M.D. Fla. 2018) (quoting *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150 (9th Cir. 2002))).  Nominative fair use differs from classic fair use, where "the defendant has used the plaintiff's mark to describe the defendant's own product." *Commodores Entm't Corp. v. McClary*, 314 F. Supp. 3d 1246 (citing *Cairns*, 292 F.3d at 1150).  The Eleventh Circuit noted that it has not yet addressed nominative fair use as a defense. *See id.*  As the Eleventh Circuit in *Parsons* noted, there is a three-part Ninth Circuit test, as articulated in *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308 (9th Cir. 1992).  The Ninth Circuit in *New Kids on the Block* found that a defendant is entitled to a defense of nominative fair use if it can establish that:

> First, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.

*Id.*  However, the Eleventh Circuit in *Parsons* did not adopt for themselves the *New Kids on the Block* three-part test.  While the Eleventh Circuit has looked at the issues of nominative fair use before, in *Parsons* it applied and cited the *New Kids* Ninth Circuit test because the district court chose to.  Because the parties here argue the issue of nominative fair use mainly on the three elements laid out in *New Kids*, the Court analyzes those factors accordingly.

## ANALYSIS - NOMINATIVE FAIR USE

### 1. *Readily Identifiable*

To succeed on the defense of nominative fair use, Defendants must first establish that Plaintiff's product or service is not readily identifiable without use of the trademark. The Ninth Circuit, through analogies of other prominent trademarks, has described situations where there are no "descriptive substitutes," when a good or service is identifiable only by their trademarks. *See New Kids on the Block*, 971 F.2d at 306. The Ninth Circuit in *New Kids* wrote that "one might refer to 'the two-time world champions' or 'the professional basketball team from Chicago,' but it's far simpler (and more likely to be understood) to refer to the Chicago Bulls." *In Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1153 (9th Cir. 2002), the court wrote that "one might refer to 'the English princess who died in a car crash in 1997,' but it is far simpler (and more likely to be understood) to refer to 'Princess Diana.'" In the same vein, one might refer to "that 1970's R&B group" or "the group that sang 'September,'" but as the Ninth Circuit found with Princess Diana and the Chicago Bulls, it is far simpler (and more likely to be understood) to refer to "Earth, Wind & Fire." Thus, the Court holds that Earth, Wind & Fire is not readily identifiable without the use of its name and Defendants establish this prong of the nominative fair use defense.

### 2. *Reasonably Necessary Use*

Next, Defendants must establish that it used only so much of the mark as is reasonably necessary to identify the plaintiff's product or service. The size, style, and

appearance of the advertising displays are pertinent factors for courts to weigh. *See*

*Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969). For

example, a soft drink competitor may use the "Coca-Cola" or "Coke" name but would

not be entitled to the distinctive lettering. *See New Kids*, 971 F.2d at 308 n. 7. In

*Volkswagenwerk*, the defendant "did not use Volkswagen's distinctive lettering style or

color scheme, nor did he display the encircled "VW" emblem." 411 F.2d at 352.

However, what is "reasonably necessary" to identify the plaintiff's product may

differ from case to case. *See Cairns*, 292 F.3d at 1154. If "the description of the

defendant's product depends on the description of the plaintiff's product, more use of the

plaintiff's trademark is 'reasonably necessary to identify the plaintiff's product' than in

cases where the description of the defendant's product does not depend on the description

of the plaintiff's product." *Id.* The Ninth Circuit in *Cairns* illustrates this well:

> General Motors would probably be able to sell its Oldsmobile Eighty-Eight
> without any reference to a basketball star who, like the car, received an award
> three years in a row. *See Abdul-Jabbar*, 85 F.3d at 409. But it is doubtful
> whether Franklin Mint would be able to sell its "Diana, Princess of Wales
> Porcelain Portrait Doll" without prominent reference to Princess Diana. Not
> every Franklin Mint customer can be expected to recognize Princess Diana's
> features on the doll. And even fewer Franklin Mint customers can be expected to
> recognize Princess Diana's royal tiara and bolero jacket on the doll. Accordingly,
> a caption reading "Diana" is "reasonably necessary" to identify Princess Diana.
> Similarly, a photograph showing Princess Diana wearing her royal tiara and
> bolero jacket is "reasonably necessary" to identify these accessories of Princess
> Diana. In a nutshell, Franklin Mint had to ensure that its customers understood
> the references to Princess Diana, and it did what was "reasonably necessary" for
> this purpose. Thus, the second element of the New Kids nominative fair use test
> is also met.

292 F.3d at 1154. Here, if the Court were to base the second element's analysis on the

size, style, and appearance of Defendants' first promotional logo, it may have been

7

simpler.  Defendants promoted its concerts with almost a mirror image name and logo combination.  Defendants' conduct seemed to be clearly above what was reasonably necessary.  However, after the Plaintiff's complaint, Defendants changed its advertising. It stopped using Earth, Wind & Fire's distinctive font, took out the distinctive "Phoenix" logo, switched the title of its musical shows from "Earth Wind & Fire Legacy Reunion" to "Legacy Reunion of Earth Wind & Fire Alumni," and changed the color scheme. Further, the facts here are not analogous to the facts in *Abdul-Jabbar* where General Motors wouldn't necessarily need Kareem Abdul-Jabbar to sell its Oldsmobile Eighty-Eight.  85 F.3d at 409.  The facts are more analogous to Princess Diana and the Porcelain Portrait Doll.  Like the *Cairns* courts reasoning, Defendants would likely be unable to sell its service without prominent reference to Earth, Wind & Fire.  Like how customers would likely not recognize Princess Diana's features on the doll without a caption, Defendants' band would likely not be able to show consumers what they are performing without an "Earth, Wind & Fire" caption.  *Cairns*, 292 F.3d at 1153.  At a minimum, a logo that reads "Earth Wind, & Fire" is necessary for identification and recognition purposes.  Next, Defendants swapped out the "Phoenix" logo for a design that includes small images that depict a mountain range, yin and yang sign, and a small fire to represent "Earth, Wind & Fire."  This is not like the use of the trademark "Godzilla," as Defendants are not using the real "Phoenix" logo but a logo they presumably created after Plaintiff demanded it to stop using the infringing logo.  *See Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1209, 1211 (C.D. Cal 1998).  Accordingly, the Court finds that the second element of the *New Kids* three-part nominative fair use defense is also met.

3. *Suggesting Sponsorship*

Lastly, Defendants must prove that it does nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder. While the third and final element is a closer call than the two above, the Court holds that the third element of the *New Kids* nominative fair use test is not met. Referring to *Cairns*, the Ninth Circuit was instructive in walking through element three. 292 F.3d at 1155-56. There, the court found that the third element was met. *Id.* The court found persuasive that the advertisements for the Princess Diana related products did not claim that they were sponsored or endorsed by the trademark holder, where other of the defendant's celebrity-related products do state that they are "authorized" by a trademark holder. *Id.* Further, the defendants were exact in their wording as they advertised and stated the Doll was "dressed in the only authentic *replica* of the stunning designer gown with bolero jacket sold at Christie's Auction." *Id.* at 1156 (emphasis added). The Ninth Circuit found that the word authentic suggested an authentic portrayal of the past. Here, the parties' arguments are made less on the exact wording of the advertisements (like *Cairns*), but, whether the advertisements as a whole imply sponsorship. Here, the Court agrees with Plaintiff's arguments that Defendants' usage of "Legacy Reunion of Earth Wind & Fire" lacks clear disclaimer or limiting language about who is performing. While there is no explicit claim of sponsorship like the defendant in *Cairns*, the silence here is not as meaningful as the *Cairns* defendant also had other goods with explicit trademark authorizations. Further, as Plaintiff persuasively noted, Defendants combined the advertising with text that discusses the Earth Wind & Fire's legacy. The website states that the band "dominated the 70's with their monster grooves and high energy, danceable

9

hits, garnering 20 Grammy Award nominations and a Hall of Fame Induction along the way." It further states that "[t]he style and sounds of the greatest hit recordings by Earth, Wind & Fire were built by founder Maurice White and the contributions of a stellar collective of some of the best musicians in the world throughout the decades." While the Court understands that there is dispute on how prominent of a role the musicians performing in Defendants' music group played in the Earth Wind & Fire group, Defendant's advertisements "draw a close, unmistakable association with Earth, Wind & Fire to a degree unwarranted by the historical record. *See Parsons v. Regna*, 847 Fed. App'x. 766, 770 (11th Cir. 2021). Regardless of if Defendants' musicians were technically sidemen or members, the advertisement and marketing were still deceptive and misleading as to whether the main (or most prominently known) members of the band would be performing. The use of the word "alumni" is not enough to dispel the notion that Defendants' band is not sponsored.

The Court notes that the claims here are closer than the claims in *Parsons*. There, the Alan Parsons Project had over 500 musicians and vocalists, none of whom were ever considered or credited as members of the group. *See Parsons*, 847 Fed. App'x. 776, 774 (11th Cir. 2021.). Further, Alan Parsons and Eric Woolfson were the sole members, meaning, there could not have been any ex-members. *Id.* However, the bottom line is still the same—while there are some original musicians and members that are performing, the advertisements are overstating the originality of the group. Plaintiff shows this through multiple consumer online posts, commenting with frustration on their expectations based on advertisements verses what they received.

Finally, Defendants' write that *Brother Records, Inc. v. Jardine,* 318 F.3d 900 (9th Cir. 2003) is "factually inapposite" but does not explain why. Instead of explaining why, Defendants' point the Court's attention to an unreported decision in *Cleopatra Records, Inc. v. Bailey,* No. CV 04-3120 GAF (FMOx)(C.D. Cal. Apr. 13, 2005). The Court finds the application of *Cleopatra* unpersuasive. There, the name "Hollywood Rose" was a much more significant size on the logo than "Guns N' Roses," and the band itself was identified by the leading phrase "Hollywood Rose." Here, the band is identified as "Legacy Reunion of Earth Wind & Fire Alumni," which may confuse consumers, as mentioned above. The Court does not disregard the argument that the order of wording may have a substantial impact on the likelihood of consumer confusion in some cases, but not here. In *Kassbaum v. Steppenwolf Prods., Inc.,* the Ninth Circuit held that the phrases 'Formerly of,' 'Original Member of,' and 'Original Founding Member of,'' immediately preceding the band name greatly reduced the likelihood of confusion about the source of the band's music. 236 F.3d 487, 493. The dispute here is partly about the size of the role Defendants' musicians played on Earth, Wind & Fire, not about whether the musicians here actually played with Earth Wind & Fire at some point. Thus, the order of wording does not cure the confusion like it did in *Kassbaum.* Accordingly, the Court finds that the third and final element of the *New Kids* nominative fair use test is not met. Thus, the Court denies summary judgment to Defendants on the grounds of nominative fair use because the record does not show that Defendants did enough to dispel sponsorship by Plaintiff.

## LEGAL STANDARD – ACQUIESCENCE

"Acquiescence" requires that "1) the plaintiff actively represented it would not assert a right or claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *University of Alabama Bd. Of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1281 (11th Cir. 2012). "Active consent" does not necessarily mean an explicit promise not to sue. *Id.* at 1282. It only requires "conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that plaintiff would not assert his trademark rights against the defendant." *Id.* (citing *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 547-48 (10th Cir. 2000)).

## ANALYSIS – ACQUIESCENCE

On the first element, Defendants argue that Plaintiff "specifically and actively represented that Defendants' current LEGACY REUNION Graphics was 'preferred over the current logo that is being used to promote upcoming concerts.'" Defendants argue that the statement was clear in signaling to Defendants that Plaintiffs would not assert a right or a claim based upon the Current LEGACY REUNION Graphics. However, after reviewing the entire email, the Court finds the short statement regarding "preference" much less persuasive. The entire quote is this: "I explained that while I was not in position to agree that the matter was resolved, the attached proposed logo was preferred over the current logo that is being used to promote upcoming concerts." Further, saying that something is "headed in the right direction" is not an assurance to not assert

trademark rights.  While active consent does not require an explicit promise not to sue, the record lacks evidence showing that Plaintiff actively represented it would not assert this infringement claim.

Looking at element two (inexcusable delay between active representation and assertion) in the light most favorable to the nonmoving party, Plaintiff states that the two shows performed were shows that Defendants were already contractually committed to. Plaintiff states further that after, Defendants did not perform, enter into an agreement to perform, promote, or sell a ticket at any venue for two-and-a-half years after Plaintiff demanded they stop their infringing activities.  Accordingly, the Court finds that Defendants have failed to meet its burden of proving the acquiescence defense.

## LEGAL STANDARD – ESTOPPEL

Estoppel requires that: "(1) the party to be estopped misrepresented material facts; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped intended that the misrepresentation be acted on or had reason to believe the party asserting the estoppel would rely on it; (4) the party asserting the estoppel did not know, nor should it have known, the true facts; and (5) the party asserting the estoppel reasonably and detrimentally relied on the misrepresentation." *Dawkins v. Fulton Cty. Gov't*, 733 F.3d 1084, 1089 (11th Cir. 2013) (citing *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1326 (11th Cir. 2008)).

## LEGAL ANALYSIS - ESTOPPEL

Defendants again chiefly argue on a particular line from an email sent by Plaintiff's counsel to Defendants' counsel. As the Court noted above, when viewing the entire statement articulated by Plaintiff's counsel, the prominence of the quoted statement is overstated. Defendants' counsel could not have reasonably relied on the four words "preferred over the current logo" when the words proceeding that were, "I explained that while I was not in position to agree that the matter was resolved…" And again, just because something is "headed in the right direction" does not guarantee any result or outcome. Further, the Court agrees with the Plaintiff that even not considering the first element, Defendants cannot prove the fourth element—showing they did not know Plaintiff objected to the use. The Court holds that Defendants have failed to prove the affirmative defense of equitable estoppel and declines to enter summary judgment as to this defense.

## LEGAL STANDARD – LACHES

To successfully assert laches as a defense, Defendants must prove that there was: "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Pinnacle Advertising and Marketing Group, Inc. v. Pinnacle Advertising and Marketing Group, LLC*, 7 F.4th 989, 1005 (11th Cir. 2021) (citing *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997)). Application of this doctrine is flexible and entails an examination of the amount of delay and the prejudice caused by

the delay. *See Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC,* 703 F. Supp. 2d 1307, 1315 (S.D. Fla. 2010).

In trademark infringement cases, because the Lanham Act does not contain a statute of limitations, the Court considers the "the [limitations] period for analogous state law claims as the touchstone for laches." *Kason,* 120 F.3d at 1203. The analogous Florida limitations period for this type of action is four years. *See* Fla. Stat. § 95.11(3); *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986).


## LEGAL ANALYSIS – LACHES

First, while there is dispute between the parties as to how long and why there was a delay, there is no doubt that there was a delay by Plaintiff in asserting the claim. The Eleventh Circuit calculates delay from the moment "the plaintiff knows or should know [it] has a provable claim for infringement." *Kason,* 120 F.3d at 1206. It seems as the parties agree as to the dates of October 2019 to March 2023. Plaintiff is correct in the fact that it filed suit before the four-year Florida limitations period. Further, they allege that they filed the case within six months of Defendants resumed public performances in September 2022. This is analogous to *Commodores Entm't Corp. v. McClary*, 879 F. 3d 1114, 1142 where there was a gap in time between the cease-and-desist letter because the defendant acted and formed a group to begin performing years later. The Eleventh Circuit held that the district court did not err in passing on the laches defense. *Id.*

Defendants argue that it expended significant time and effort promoting its brand and it would be unfair to let plaintiff bring suit after sitting idly by. The Court recognizes the

argument of "waiting to see how successful the business will be and then sue to take away the good will developed in the interim." However, in viewing all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, Defendants' counsel did not follow up after the "preferred email," and Plaintiff states that Defendants themselves stopped touring after. When Plaintiff discovered Defendants had started advertising shows again, it did not delay in bringing the claim.

The bottom line is that the delay is less than four years. Because of that, Plaintiff's claims are not barred by laches. *See Unique Sports Products, Inc. v. Babolat VS*, 403 F. Supp 2d 1229, 1240 (N.D. Ga. 2005).


## CONCLUSION

Accordingly, the Court DENIES Defendants' Motion for Partial Summary Judgment.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Court next addresses Plaintiff's Motion for Summary Judgment. Plaintiff argues that Defendants are liable for Trademark Infringement, Unfair Competition, and False Advertising under the Lanham Act as a matter of law.

## LEGAL STANDARD – TRADEMARK INFRINGEMENT

"[T]o prevail on a trademark infringement claim based on a federally registered mark, 'the registrant must show that (1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive.'" *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (quoting *Burger King Corp.*, 710 F.2d at 1491).

## LEGAL STANDARD – FALSE DESIGNATION OF ORIGIN

"[T]o establish liability [for false designation of origin] under § 43(a) [of the Lanham Act], the plaintiff must prove...: (1) its mark is inherently distinctive or has acquired secondary meaning, (2) its mark is primarily non-functional, and (3) the defendant's mark is confusingly similar." *University of Florida v. KPB, Inc.*, 88 F. 3d 773, 776-77 (11th Cir. 1996).

## LEGAL STANDARD – FALSE ADVERTISING

"[T]o establish…a false advertising claim, the movant must establish that: "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been-or is likely to be- injured as a result of the false advertising." *Osmose, Inc. v. Viance, LLC*, 612 F. 3d 1298, 1308 (11th Cir. 2010).

## LEGAL STANDARD - LIKELIHOOD OF CONFUSION

The "touchstone of liability in a trademark infringement action is not simply whether there is unauthorized use of a protected mark, but whether such use is likely to cause consumer confusion." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007). The Eleventh Circuit in *Custom Mfg.* cited to *B & L Sales Associates v. H. Daroff & Sons, Inc.*, 421 F.2d 352, 353 (2d Cir. 1970), stated that, "the federal remedy against trademark infringement is not plenary, and is only available when the plaintiff can show a likelihood of confusion, mistake or deception arising in the market as a result of defendant's use of the mark registered to plaintiff." Here, Plaintiff notes that its Lanham Act claims of unfair competition and false advertising are broader than trademark infringement because they do not require misuse of a registered mark and focus on a likelihood of confusion.

The Eleventh Circuit considers seven factors in assessing whether or not a "likelihood of confusion" exists: (1) the type of mark (in short, whether the "relationship

between the name and the service or good it describes" is such that the chosen name qualifies as generic, descriptive, suggestive, or arbitrary); (2) the similarity of the marks (based on "the overall impressions that the marks create, including the sound, appearance, and manner in which they are used"); (3) the similarity of the goods ("whether the products are the kind that the public attributes to a single source"); (4) the similarity of the parties' retail outlets, trade channels, and customers ("consider[ing] where, how, and to whom the parties' products are sold"); (5) the similarity of advertising media (examining "each party's method of advertising" to determine "whether there is likely to be significant enough overlap" in the respective target audiences such "that a possibility of confusion could result"); (6) the defendant's intent (determining whether the defendant had a "conscious intent to capitalize on [the plaintiff's] business reputation," was "intentionally blind," or otherwise manifested "improper intent"); and (7) actual confusion (that is, whether there is evidence that consumers were actually confused). *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335-41 (11th Cir. 1999).

Of the seven factors, the Eleventh Circuit stated that the most important are mark strength and actual consumer confusion. *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 935–38 (11th Cir. 2010). The relevant audience is the "purchasing public," which includes both "those who are potential direct purchasers of the allegedly counterfeit goods" and "potential purchasers of the trademark holder's products who encounter allegedly counterfeit goods in a post-sale context - for example, in a direct purchaser's possession." *See United States v. Torkington*, 812 F.2d 1347, 1352 (11th Cir. 1987).

Moreover, while these seven subsidiary findings typically inform a court's determination of the likelihood of confusion, a court must also consider the unique facts of each case. *Custom*, 508 F.3d at 650. These factors imply no mathematical precision but are simply a guide to help determine whether confusion is likely. *Id* (citing *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)). They are also interrelated in effect. *Id.* Each case presents its own complex set of circumstances and not all these factors may be particularly helpful in any given case. *Id.* The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way. *Id.* The Court will address and weigh each element below.

## LEGAL ANALYSIS – LIKELIHOOD OF CONFUSION

1. <u>Strength of Allegedly Infringed Mark\*</u>

As stated above, a mark's strength is one of the most important factors in the seven-factor balancing test. "The stronger the mark, the greater the scope of protection accorded it[;] the weaker the mark, the less protection it receives." *Frehling Enters.*, 192 F.3d at 1335. *Frehling* explains that the strength of the marks should be assessed in two ways:

> **First**, it classifies the mark as "generic," "descriptive," "suggestive," or "arbitrary" based on the relationship between the mark and the service or good it describes. Generic marks are the weakest and are not entitled to protection -- they refer to a class of which an individual product is a member (for example, "liquor store" used in connection with the sale of liquor). Descriptive marks describe a characteristic or quality of an article or service (for example, "vision center" denoting a place where glasses are sold). Suggestive marks suggest characteristics of the goods and services and require imaginative effort by the

consumer in order to be understood as descriptive (such as "penguin" being applied to refrigerators). Finally, arbitrary marks -- the strongest of the four categories -- bear no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services). Not surprisingly, then, arbitrary marks are the strongest of the four categories. **Then**, after categorizing the nature of the mark, the factfinder considers "the degree to which third parties make use of the mark." "The less that third parties use the mark, the stronger it is, and the more protection it deserves." (emphasis added).

*Frehling Enters.*, 192 F.3d at 1335. Further, a mark's strength may be enhanced beyond its classification if it has "incontestable status." See *Frehling Enters.*, 192 F.3d at 1336. A mark is "incontestable" if it has been registered for five years with the Patent & Trademark Office ("PTO"), its holder has filed the affidavit required by 15 U.S.C. § 1065(3) with the PTO, and the PTO has accordingly declared the mark "incontestable." *Id.* "An incontestable mark is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Sovereign Military*, 809 F.3d at 1183.

First, because the parties did not look to classify Plaintiff's marks, the Court must do so. Plaintiff's marks are not generic or descriptive. The "EARTH WIND & FIRE" or "Phoenix" marks bear no obvious relationship to the music industry as a whole. There may be a slight suggestive dimension between Plaintiff's music and the marks, but it seems to be beyond an "imaginative effort." Accordingly, the Court finds Plaintiff's marks are best classified as arbitrary marks.

Next, the Court must consider the degree to which third parties make use of the mark. Courts have long recognized that the extent of third-party use of a mark is an essential factor in determining a mark's strength. *See John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983). A "strong trademark is one that is rarely used by parties other than the owner of the trademark, while a weak trademark is

one that is often used by other parties." *Id.* at 973-74.  Thus, the number of third-party

users is important, but there is no hard-and-fast rule establishing a single number that

suffices to weaken a mark.  Rather, in assessing the impact of third-party uses, the

Eleventh Circuit considers "the entire name a third party uses, as well as the kind of

business in which the user is engaged." *Safeway Stores, Inc. v. Safeway Discount Drugs,*

*Inc.*, 675 F.2d 1160, 1165 (11th Cir. 1982).

    The parties brief this issue a bit more closely.  Defendants argue that the strength of

Plaintiff's marks are diluted because there are a number of third parties that use the same

or similar mark for identical entertainment services.  Plaintiff succinctly states that

Defendants "ignore the source-identifying nature of those tributes show, which

strengthen rather than weaken [Earth, Wind & Fire]'s marks as described above."

    As Defendants point out, the Eleventh Circuit has found that a mark has been

weakened by third-party use based on a relatively small number of third-party users, like

in *Ambrit, Inc. v. Kraft Inc.*, 812 F.2d 1531, 1539 (11th Cir. 1986)[1].  Thus, when thinking

from a pure numbers' perspective, Defendants have the edge.  However, when looking

deeply at factors such as the entire name of the third party uses, Plaintiff seems to have

the edge.  Each third-party use listed by Defendants include the word "tribute"

somewhere in the name.  Further, many of the websites are make clear exactly who is

performing.  For example, the website for "The Ultimate Earth, Wind & Fire Tribute

Band" includes information of the performers, which explicitly states that the

Saxophonist Curtis Johnson "[t]oured with the original EARTH, WIND & FIRE BAND."

---

[1] See *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1539 (11th Cir. 1986) (affording lesser protection where eight third-party users in the same market employed similar trade dress).

The website for "Elements: The Ultimate Earth Wind and Fire Tribute" writes that "covering a band as ground-breaking and multi-talented as Earth Wind and Fire is no small task, but Elements does it with style." The website for "Kalimba – Earth Wind & Fire tribute" explicitly stated that the band seeks to "accurately reproduce the infectious grooves." Defendants' use is different from the third party uses it cites to. Again, their name is "Legacy Reunion of Earth Wind & Fire Alumni," which implies not that they are "covering" or "reproducing" the music but were the original performers. They also are not transparent like the tribute band that featured Curtis Johnson and stated that he "toured with the original group." Defendants' final example is of a band that advertises themselves as "The Earth Wind, & Fire Experience featuring The Ray Howard Band." While this example does not have "tribute" in the name as the others do, it still denotes their performances as an Earth, Wind & Fire "experience" and that the performance is by an entirely different band, The Ray Howard band. Accordingly, the Court finds that Plaintiff's mark is not weakened by third-party usage.

Lastly, it is well documented that Plaintiff has spent millions on advertising and strengthening the "Earth Wind & Fire" mark. The group has sold millions of records and has been performing for many decades. Evidence is persuasive in showing that Plaintiff's mark would be recognizable by consumers.

The Court finds that the third-party uses cited by Defendants do not significantly diminish the public's perception that the mark identifies services connected with the owner. *See Breakers of Palm Beach, Inc. v. Int'l Beach Hotel Dev.*, 824 F. Supp. 1576, 1583. Considering these factors, the Court finds that a reasonable jury would be compelled to find that Plaintiff's mark is a strong one, entitled to broad protection, and

further finds that there are no disputed issues of material fact on this issue to submit to the jury.

   2.   Similarity of the Infringed and Infringing Marks

   When evaluating the similarity between two service marks, courts should consider "the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." *Frehling*, 192 F.3d at 1337.

   In comparing Defendants' new logo to Plaintiff's marks, there are many differences. While both logos feature the words "Earth Wind & Fire," Defendants are not using the same stylized version of the word mark. It instead uses a font that looks like, (if not is), New Times Roman. Further, Defendants added "Legacy Reunion" and "Alumni" to the logo. Lastly, they ditched Plaintiff's "Phoenix" logo, and instead use a logo that has a sun at the center with images depicting the elements of earth, wind, and fire.

   However, the difference in appearance of a mark is not the end of the analysis. The addition of a relatively generic term of lesser importance does not significantly reduce the chance of consumer confusion. *See Homes & Land Affiliates, LLC v. Homes & Loans Magazine*, LLC, 598 F. Supp. 2d 1248, 1262 (M.D. Fla. 2009) ("Defendants' inclusion of "magazine"—an additional word of lesser importance—does not reduce the danger of potential confusion."). We see that here as Defendants add "Legacy Reunion" and Alumni" on both ends of "Earth Wind & Fire." Further, the cases Defendants cite to are unpersuasive. *In Mango's Tropical Café, Inc. v. Mango Martini Rest. & Lounge, Inc.*, 844 F. Supp. 2d 1246, 1255 (S.D. Fla. 2011), the court found that the logo containing the

words, "Mango Martini" create an entirely different connotation when compared to
"Mango's Tropical Café." This conclusion does not cross-over as smoothly with the
facts here. Adding "Legacy Reunion" and "Alumni" to "Earth Wind & Fire" does not
change the composition or impression of the logo in its entirely like the difference of
"Tropical Café" to "Martini" does. Further, in *Michael Caruso and Co. v. Estefan
Enterprises, Inc.*, 994 F.Supp. 1454, 1460-61 (S.D. Fla. 1998), the court held that the
marks "Bongo" and "Bongos Cuban Café" were not similar. Again, the analysis of the
marks there do not seem to fit here. If Defendants were to use just "Earth" from
Plaintiff's mark "Earth Wind & Fire," *Michael Caruso and Co.* would be a persuasive
case here. The issue of similarity is a close call. While there is a lack of visual
similarity, the terms used in the marks are still quite similar. Accordingly, the Court
finds that this factor weighs slightly in the favor of a finding of a likelihood of confusion.

### 3.  Similarity of the Goods and Services the Marks Represent

"The greater the similarity between the products and services, the greater the
likelihood of confusion." *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 976
(11th Cir.1983) (quoting *Exxon Corp. v. Texas Motor Exch., Inc.*, 628 F.2d 500, 505 (5th
Cir.1980)). The Court must determine whether "the [services] are the kind that the public
attributes to a single source, not whether or not the purchasing public can readily
distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338.
In other words, the question is whether "the goods [or services] are so related in the
minds of consumers that they get the sense that a single producer is likely to put out both

goods [or services]." *Id.*  (quoting *E. Remy Martin & Co., S.A. v. Shaw-Ross Intern. Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985)).

Defendants do not brief much of an argument here, stating that the Court should take a more "granular analysis which is not possible based on the current evidence submitted in the record by Plaintiff.  Here, the facts on their face support a finding of similarity of services offered.  Both parties offer live musical performances of "Earth Wind & Fire" music.  Further, the chief Eleventh Circuit case *Frehling* noted that while "the compositional differences matter, they are not dispositive; we focus, rather, on the reasonable belief of the average consumer as to what the likely source of the goods was." 192 F.3d at 1338.  It is not a far cry to think that an average consumer looking for an Earth Wind & Fire concert would believe that they could acquire that experience from either Plaintiff or Defendants.[2]  In fact, Plaintiff brings to light actual customers confused on the experience of Defendant's musical performance.  Thus, the "similarity in goods and services the marks represent" prong weighs in favor of Plaintiffs.

### 4.  Similarity of the Parties' Trade Channels and Customers

Differences in sales methods can help consumers distinguish between sources of goods and services.  *Frehling*, 192 F.3d at 1339 ("Dissimilarities between the retail

---

[2] *Silverton Mortg. Specialists, Inc. v. FDIC for Silverton Bank, N.A., No. 1:09-CV-1583-AT, 2012 WL 13001592 (N.D. Ga. Sept. 28, 2012)* ("Plaintiff and Bank Defendants both provided mortgage services. While Plaintiff's lending practices were focused nearly exclusively on residential mortgages and the Bank Defendants focused predominantly on commercial mortgage lenders, these differences are not dispositive. Mortgages are sufficiently related in the mind of the public that a consumer could reasonably conclude they could have come from a single producer, leading to a 'high degree of similarity' between them." The Court found that "it is not difficult to imagine that an average consumer walking into a "bank" would believe that they could acquire a residential mortgage from that institution. Accordingly, this factor also leans in Plaintiff's favor.").

outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception."). Conversely, similar methods of selling similar products and services are more likely to confuse consumers. *Id.* "This factor takes into consideration where, how, and to whom the parties' products [and services] are sold." *Id.* Although neither direct competition nor identical "outlets and customer bases" is required to support a likelihood of confusion, "some degree of overlap should be present." *Id.* Here, Defendants' only argument is that there is nothing to demonstrate an "overlap in the parties' trade channels," to the extent required by *Frehling.* The Court disagrees. Plaintiff writes that "the same online ticket sales methods from the same online ticketing companies are used by the parties, with the real "Earth, Wind & Fire" live concerts and Defendants' band's live concerts often included in the same online listings." Further, Defendants' concerts are identified as "Earth Wind & Fire" concerts on online ticketing websites. There are also customers that have attended both events.

This is not akin to the Eleventh Circuit Case *Michael Caruso & Co. v. Estefan Enters., 994 F. Supp. 1454, 1461* that Defendants cited. There, the defendants sold clothing merchandise in a single store in Orlando. *Id.* The plaintiff on the other hand sold products in shopping centers all over the country. *Id.* Thus, the court reasoned that "[a]lthough Defendants' clientele may include members of Plaintiff's clientele and vice versa, the two customer classes are not one and the same." *Id.*

Thus, the Court finds that there is, at a minimum, "some degree of overlap present." Accordingly, this factor also weighs in Plaintiff's favor.

5.  Similarity of the Advertising Media Used by the Parties

The "similarity of advertising" factor focuses on the methods the companies use to advertise their products, "not necessarily on the precise newspapers or magazines which are used." *Gold Kist*, 708 F. Supp. at 1301 "The greater the similarity in the campaigns, the greater the likelihood of confusion." *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1508 (11th Cir.1985).  When evaluating similarity of advertising, "the standard is whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result." *Frehling*, 192 F.3d at 1340 (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166 (11th Cir. 1982)).

Plaintiff argues that because both parties advertise using Facebook, websites, other social media, "free" local press coverage, and radio to promote their respective bands' events, there is similarity of advertising which favors likelihood of confusion. Defendants rebut and write that the respective websites and advertising actually would lead consumers to believe the two bands are distinct enterprises.  The Court agrees.  If the parties are both advertising using, for example, Facebook, there would be two separate pages.  The same idea with websites.  If anything, this should draw a distinction between the groups.  Further, the Court agrees that given the broad use of the Internet, the fact that both parties advertise on the Internet merits little weight.  If Plaintiffs were to bring more facts on the similarity of advertising campaign or method, it might have been a close call. Thus, the Court finds here that the "similar advertising" element weighs in favor of Defendants.

6.   The Intent of the Alleged Infringer to Misappropriate the Proprietor's Good Will

Courts consider the subjective intent of an accused infringer when evaluating the likelihood of similarity between marks.  *See Frehling*, 192 F.3d at 1337.  "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity."  *Id.*  at 1340; *see also AmBrit*, 812 F.2d at 1542.

Plaintiff's argument on intent hinges on Defendants' knowledge of the "Earth Wind & Fire" and "Phoenix" logos when they decided to create their own logos.  Plaintiff then go on to mis-cite *Frehling*, quoting that "this fact alone" is enough to infer confusing similarity.  192 F.3d at 1340.  *Frehling*, as quote above by the Court, actually held that "if it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, *this fact* alone *may* be enough to justify the inference that there is confusing similarity.  *Id* (emphasis added).  Further, the Court agrees with the *Caruso* court, which found persuasive that "prior knowledge of a senior user's trademark does not necessarily give rise to an inference of bad faith and may be consistent with good faith.  *Caruso*, 994 F. Supp. at 1462 (quoting *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995)).

Resolving this ambiguity in favor of the non-movant, the Court finds that Plaintiff has not presented evidence of intent or bad faith by Defendants.

7.   Existence and Extent of Actual Confusion in the Consuming Public*

"It is undisputed that evidence of actual confusion is the best evidence of a likelihood
of confusion." *Frehling*, 192 F.3d at 1340.   The actual confusion inquiry involves both
the number of instances of confusion and the kind of person confused.   *Caliber Auto.*,
605 F.3d at 936.   "All potential consumers of the relevant product or service, including
middlemen, can inform the inquiry, and the ultimate consumers deserve special
attention." *Id.* at 936-37.   Ultimately, "the quantum of evidence needed to show actual
confusion is relatively small." *Id.* at 937.   Actual confusion by a few customers is
evidence of likelihood of confusion by many customers.   *Freedom Sav. & Loan Ass'n v.
Way*, 757 F.2d 1176, 1185 (11th Cir. 1985); *Glen Raven Mills, Inc. v. Ramada Int'l, Inc.*,
852 F. Supp. 1544, 1552 (M.D. Fla. 1994).

In *Caliber*, the Eleventh Circuit importantly differentiates between types of
confusion.   "[p]erhaps as important as . . . the number of instances of confusion are the
kinds of persons confused and degree of confusion.   Short-lived confusion or confusion
of individuals casually acquainted with a business is worthy of little weight while
confusion of actual customers of a business is worthy of substantial weight." 605 F.3d at
936.   Further, "[a]ctual consumer confusion is the best evidence of likelihood of
confusion."   This circuit's caselaw makes plain that the consumers of the relevant product
or service, especially the mark holder's customers, turn the key.   All potential consumers
of the relevant product or service, including attention." *Id.* at 936-37.

In a trademark infringement case, actual confusion can be shown through reported
instances of individuals who have actually become confused about the source of the
products or services because of the similarities between the parties' trademarks. *Popular*

*Bank of Florida v. Banco Popular de Puerto Rico,* 9 F.Supp. 2d 1347, 1360 (S.D. Fla. 1998). Such instances of confusion include consumer inquiries regarding possible affiliation between the parties or attempts to purchase goods or services actually offered by the other party. *Id.* Confusion can also be shown by misdirected correspondence or telephone calls. *Id.*

Defendants argue that Plaintiff makes "vague, unsupported references to confused venues, local media, online ticketing companies, and consumers." The Court finds that contrary to Defendants' claims—the references are supported and quite clear. Plaintiff brought evidence of actual confusion shown through reported instances of individuals who have actually become confused about the source of the produces or services because of the similarities between the parties' trademarks. *See Popular Bank of Florida,* 9 F.Supp. at 1360.

Plaintiff brings to light both emails and publicly posted online reviews from consumers of Defendants that support actual confusion. For example, one such email stated that "I attended the [Earth, Wind & Fire] legacy reunion in Pensacola, Florida in hopes of seeing Philip Bailey, Verdine White and others from the original band. Their pictures are on the advertisement, posters, or whatever. The impression of Reunion would be original band members from various years. Why is it misleading? The pictures should be removed from advertisement. The details read friends and family or something like that." Another email recently complained that Defendants' advertising amounted to a "bate[sic] and switch," and advised that she was demanding her money back. A third party's Facebook comment next to a picture Richard Smith playing the guitar behind

colorful "'Earth Wind & Fire' says, "If the three remaining Original Members are not in this tour, this is basically a rip-off!"

The above-mentioned evidence must be afforded "substantial weight" by Eleventh Circuit standards. First, the emails and online reviews are from actual consumers of Defendants' musical performances, which is both afforded "special attention" and the "best evidence of actual confusion." *See Caliber Auto.*, 605 F.3d at 936-37. Defendants dispute the evidence by trying to downplay the number of instances of actual confusion. However, as stated by the Eleventh Circuit in *Freedom Sav.*, actual confusion by a few customers is evidence of likelihood of confusion by many customers. 757 F.2d at 1185. As the customers of the relevant product or service "turn the key," the Court finds that these facts satisfy the "small" quantum of evidence needed to show confusion under *Caliber Auto.* 605 F.3d 931, 936-37. Accordingly, this important factor favors Plaintiff.

8. Evaluation of the Factors.

The Eleventh Circuit discussed how to weigh these seven factors, noting that the process "entails more than the mechanistic summation of the number of factors on each side." *Custom Mfg. & Eng'g, Inc. v. Midway Servs.*, 508 F.3d 641, 649 (11th Cir. 2007). "These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Id.* at 650.

The seven *Frehling* factors strongly support a finding of a likelihood of confusion in Plaintiff's favor. While Defendants' may have convinced the Court to lean in favor of factors five and six, and factor two was a close call for Plaintiff, the two critical factors of

mark strength and actual confusion (as well as factors three and four) lean towards a finding of a likelihood of confusion. The evidence here as to the balance of these factors tip overwhelmingly in Plaintiff's favor. Thus, the Court holds that there is a compelling showing for a likelihood of confusion.

**CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** that the Defendants' Motion for Summary Judgment is **DENIED,** and the Plaintiff's Motion for Summary Judgment of Liability on Lanham Act Claims is **GRANTED**. The Trial will follow on damages.

DONE AND ORDERED in Chambers at Miami, Florida this _____ of March 2024.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

«Counsel»